FILED

JUL 2 1 2025

RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF WEST VIRGINIA

DAVID STEBBINS,                                             PLAINTIFF

VS.                              Case 2:24-cv-00140

JOSHUA MOON AND LOLCOW LLC                                  DEFENDANTS

### FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT AND LIBEL

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following First Amended Complaint for six (6) counts of copyright infringement, as well as seven (7) counts of libel against defendants Joshua Moon and Lolcow LLC. I am not changing anything from my original Complaint, which was only for copyright infringement. So if the Court has already reviewed the sections of the original Complaint, it can skip over those corresponding sections and cut straight to reading the sections on libel. To assist the Court in this regard, I will bookend the titles of all new sections with triple astericks (***), so the Court can scroll down, look for those triple asterisks, and read only those sections.

### I: PARTIES TO THE CASE

1.      I am a YouTuber and a Twitch streamer who goes by the alias "Acerthorn." My YouTube channel can be found at the following URL:

www.youtube.com/@acerthorn

2.      Co-Defendant Joshua Moon is the owner and operator of the business entity Lolcow LLC, a business which itself owns and operates the website of Kiwi Farms. Lolcow LLC is head-quartered in the city of South Charleston, West Virginia, as evidenced by the following URL:

https://apps.wv.gov/SOS/BusinessEntitySearch/Details.aspx?Id=RXSHUys+NDVEHasTdXKhEw==&Search=+Cc7MFoHy7HVwDC6ZB2Now

### II: JURISDICTION AND VENUE

3.      This Court has federal question subject-matter jurisdiction, as I am suing over copyright infringement.

4.      This Court has personal jurisdiction and proper venue because at least one of the defendants (Lolcow LLC) is headquartered inside this district.

### III: FACTS OF THE CASE

5.      The following facts are necessary to understand this case.

### III-1: What is Kiwi Farms?

6.      Kiwi Farms isn't just "a" message board website. It is one of the most vile and toxic communities on the entire Internet. The entire website is dedicated almost exclusively to harassing, doxxing, and cyberstalking their victims; Barnes & Noble sells books, Playboy

produces pornography, WWE produces professional wrestling events, and Kiwi Farms harasses, doxxes, and cyberstalks people for its users' demented amusement. It's literally what they do. It's literally their entire business model. See www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ...

> "Kiwi Farms is a forum similar in design to 4chan or 8chan, where anonymous posters gather. But instead of just spreading noxious discourse, Kiwi Farms users turn to the site to plan and coordinate. They work to make the lives of their targets a living hell. Their tactics include doxxing, SWATing, defaming, encouraging self-harm, and stalking, online and sometimes off.
>
> Kiwi Farms harvests anguish. It thrives on pain and revels in death. Users of the innocuously named forum prey on the vulnerable and marginalized—people who are transgender, neurodivergent, disabled, financially struggling—with persistent and twisted harassment campaigns... reporters are wary of becoming targets themselves. The users call their victims "lolcows" because their pain can be milked for laughs. The group made its purpose clear on its Twitter page before it was taken down: 'Gossip and exploitation of mentally handicapped for amusement purposes.'
>
> Kiwi Farms users deploy slightly different tactics for various victims, but the rough beats are the same. First, the group assembles extensive dossiers. Then they use the information (some true, some contorted, some fabricated) to torment their targets."

7.    In fact, back in 2022, it got so bad that their server host Cloudfare had terminated its service for Kiwi Farms. The *reason* they did that is because the harassment, doxxing, and cyberstalking had gotten so bad that it literally presented an imminent threat to people's lives! See www.washingtonpost.com/technology/2022/09/03/cloudflare-drops-kiwifarms/

> "'As Kiwi Farms has felt more threatened, they have reacted by being more threatening,' Prince said. 'We think there is an imminent danger, and the pace at which law enforcement is able to respond to those threats we don't think is fast enough to keep up.'
>
> Prince said contributors to the forum were posting home addresses of those seen as enemies and calling for them to be shot."

8.    Of course, this alleged "threat to life" has been going on for quite some time now. In fact, the website has been known to harass at least three different people to the point where those people kill themselves![1] In fact, that website is so gleefully dedicated to driving their victims to harassment that they *literally have a counter* on their website (known as the "Kiwi Kill Count")

---

[1] See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Its victims reportedly include Julie Terryberry, who in 2016 took her life after being targeted by users of the site. Two years later, after years of harassment from Kiwi Farms trolls, Chloe Sagal lit herself on fire in a public park. In June 2021, an American video game developer based in Japan, named David Ginder, took their life amid a campaign of Kiwi Farms abuse").

dedicated to keeping track of how many people they've managed to make kill themselves![2]

9.     This website serves as Joshua Moon's only non-nominal source of income. He admits to as much on the website, where he (under the username "Null") admits that he has suffered reputational damage from his association with the site and therefore relies on donations from his users to stay alive. See https://kiwifarms.st/threads/supporting-the-forum.27022/ ("The only reason I can afford to do this is because of small dollar donors. I am unemployable because of reputational damage done in association with the site; if I could work a regular job doing IT I would and I have tried"). At the bottom of every webpage on the site, you can find a link called "How to support the forum" that takes you to that post.

### III-1-A: Greer v. Moon

10.     One victim of Kiwi Farms who didn't take their shenanigans shitting down was Russell Greer, an independent songwriter who attempted in vain to have the rights to one of his songs sold to Taylor Swift. He sued Swift, alleging that his failure to sell the song was the result of her agents' negligence. While the case was ultimately thrown out, some people at Kiwi Farms latched onto that lawsuit and spread false allegations that he only sued Taylor Swift simply because she refused to have sex with him.

11.     One thing led to another, one false allegation after another, and Greer eventually wrote a book attempting to explain his side of the story. Not only did this backfire and cause the harassment to only intensify, but the people of Kiwi Farms actually reposted his entire book on the website so that users of that site (the primary audience for the book) could read it without paying him.

12.     Greer issued a DMCA Takedown regarding that book. Joshua Moon – as the owner and primary operator of the site – processed the takedown request, but refused to take the post down. Not only that, but he reposted Greer's DMCA takedown request in its entirety on the Kiwi Farms website and mocked his attempts to have the infringing posts removed!

13.     Faced with no alternative, Russell Greer sued Moon for copyright infringement, claiming that Moon was now contributorily liable for the infringement occuring on his website. The case made it to the United States Court of Appeals for the Tenth Circuit, which held that "the reposting of the takedown notice, combined with the refusal to take down the infringing material, amounted to encouragement of Kiwi Farms users' direct copyright infringement," and therefore, that Greer could proceed against Moon on a theory of contributory infringement. See Greer v. Moon, 83 F. 4th 1283, 1295 (10th Cir. 2023). Moon then appealed the case to the Supreme Court, where it was assigned Case No. 23-958. As of the original Complaint, the case was still pending before the Supreme Court. But as of the time of writing this First Amended Complaint, their Petition for Writ of Certiorari is denied by the Supreme Court.

---

2   See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Most websites aren't known for having a 'kill count.' Kiwi Farms is... Users gleefully imagined Ginder's death: 'Here's hoping for a +1 to the kiwi kill count' ... Everyone will get a point on their counter if he does it, and I only need two more to get free a milkshake").

### III-2: My Interests as a YouTuber

14.    As a YouTuber, my job is to create videos and upload them to YouTube. I am a member of the YouTube Partner Program, which means that, whenever advertisements play on my videos, I am eligible to receive a portion of that revenue. The more views my videos get, the more ad impressions get shown to viewers, which in turn increases my ad revenue. As such, everything I do as a YouTuber should be geared towards getting more views on my videos.

15.    Youtube has an extremely complex algorithm that is used to determine how many views my videos get. While nobody except the highest-ranking employees at YouTube know exactly how the algorithm works, the general consensus is that the following factors are the most important:

- **Click-through Rate**: Whenever a video's thumbnail and title is shown to a viewer with the chance to click on it to watch the corresponding video, that is known as an "impression." The percentage of impressions that result in a click is known as the click-through rate, or CTR for short.

- **Average view duration**: Whenever a viewer watches long stretches of a video, that is typically a good sign that the video is itneresting to them and keeps their attention.

- **Binging**: If you not only watch the entirety of a video (thereby giving it 100% average view duration), but then *immediately* click on another video from the same channel and watch it as well, that typically results in far more algorithmic support than if those same two videos were watched with a period of time in between, all else being equal.

- **Engagement**: Comments, likes, even dislikes all count as engagement for purposes of algorithmic support. While not as important as CTR or watch time, the general consensus is that engagement will keep people on the site longer, thereb viewing more ads.

16.    As such, everything I do as a YouTuber should be geared towards improving my overall algorithmic support. However, in order to get algorithmic support, the views, watch time, and engagement (e.g. comments) all have to happen *on YouTube*. If the watch time and engagement happens on any other site, YouTube obviously cannot factor that into its algorithm, which means my channel does not grow, get more viewers, and ultimately get more revenue.

### III-3: My Copyrights

17.    I own the following copyrights:

#### III-3-A: Copyrighted Music

18.    In February of 2023, I contracted with a composer in Argentina by the name of Augustin Navarro to compose ten original songs for my channel.

19.    The titles for these ten songs are as follows:

(a)    Acer's High
(b)    Long Prat Fall

(c)     Sigh of Relief
(d)     Section of Life
(e)     Sample of Life
(f)     Epic Moment
(g)     Blinding Rage
(h)     There Is No Hope
(i)     Smile on My Face
(j)     Ready for Action

20.     You can listen to these songs by going to the following unlisted playlist on YouTube:

www.youtube.com/playlist?list=PLpL3n7W6QqqBB_ZRVducMkGN3CRaz3isQ

21.     However, you will have to pay my channel at least $1 per month to be able to listen to these songs. Maybe, once this case gets underway, I can file under seal so the Court can hear these songs for free without me giving away free samples to the public.

22.     These were works for hire, which means that I own 100% of the copyright to these songs. These songs are legally eligible to be works for hire because they were intended to be used as background music for my YouTube channel. Therefore, they qualify as "supplementary works," specifically they were composed "as a part of a motion picture or other audiovisual work," thereby meeting the legal definition to be a work for hire under 17 USC § 101.

23.     Barring that, Navarro and I signed a contract, written by an American attorney at our behest, stating that, even if these songs are not legally eligible to be works for hire, he was still *selling* the copyrights to me. When I showed this contract to Identifyy[3], they accepted this contract as proof that I was indeed the sole copyright owner (although my attempts to do business with them fell through the cracks for other reasons), so I am confident this Court will accept this contract as proof that I am copyright holder, once I disclose it in discovery.

24.     In any event, I registered the copyright for these ten songs before I began using them in any of my videos. The registration number for these ten songs is Sru001538491. The effective date of registration is March 5, 2023.

25.     Although I have registrations for these ten songs, and these songs will invariably be included in all of my YouTube videos going forward (meaning anyone who copies any portions of my videos will, almost invariably, be copying portions of these songs as well), it is not necessary for a secondary user to criticize these songs, specifically, in order to be eligible for the "fair use" defense. My *registration* of these songs can be used as a work-around to keep me from expensively having to *register* each individual video every time it gets infringed upon, but it is not a work-around that gets around fair use law. As long as a secondary user makes a fair use of whatever videos contain these songs, their use of the music itself should also be classified as fair use. However, that still requires they actually *make fair use* of the videos, and as this Court is surely aware (and which many people on the Internet frequently get wrong), fair use requires more than just providing criticism. Criticism is certainly a good first step to fair use, but it's only one factor.

---

3   Identifyy – spelled with two Y's at the end – is an online company that assists musical artists in registering their songs for YouTube's "Content ID" system, so they can place copyright claims on videos which use those songs.

### III-3-B: The March 12, 2024 video "Kiwi Farms Goes to the Supreme Court; It Will Most Likely Fail, and Here's Why."

26.    On March 12, 2024, I posted a video to my YouTube channel called "Kiwi Farms Goes to the Supreme Court; It Will Most Likely Fail, and Here's Why." The video can be viewed at the following URL:

https://www.youtube.com/watch?v=5gXZEesiwvw

27.    During this video, I acknow-ledged the factual development mentioned in Section III-1-A and explained how I, in my person-al, non-binding laymen's opinion, did not believe the Supreme Court was likely to grant the Peti-tion for Writ of Certiorari in Joshua Moon's case. Nothing in that video was meant to be cons-trued as legal advice, and in fact, I even provided a source from a well-respected Supreme Court law firm to back up my arguments so my viewers didn't have to simply take my word for it.

28.    Throughout the video, I used six of my ten copyrighted songs as background music. The six songs used, and the timestamps in which they were used, are as follows:

    (a)    From timestamp 0:00 – 0:54, "There is No Hope" plays in the background.
    (b)    From timestamp 0:54 – 4:40, "Acer's High" plays in the background.
    (c)    From timestamp 4:40 – 8:03, "Ready for Action" plays in the background.
    (d)    From timestamp 8:03 – 13:59, "Sample of Life" plays in the background.
    (e)    From timestamp 13:59 – 17:43, "Section of Life" plays in the background.
    (f)    From timestamp 17:43 – 18:50, "Sigh of Relief" plays in the background.

29.    This means that anyone who reposts this video in its entirety necessarily infringes on *six* different copyrights, aka $4,500 - $900,000 statutory damages worth of copyright infringements. Of course, fair use is still a defense, but fair use requires more than just providing a little bit of token criticism here and there.

30.    Also, in the description of that video, you can see that I included the message "© Acerthorn, 2024 All Rights Reserved." This entitles me to the benefits of 17 USC § 401(d).

### III-3-C: The songs and video are all unpublished

31.    It is also worth noting that all ten songs, as well as the video, all fit the legal definition of "unpublished." This is because they were only ever posted to YouTube. A work is not considered "published" simply because it is posted online. This is established by "Circular 66," which is published by the US Copyright Office and is entitled to deference pursuant to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). You can find that document at the following URL:

https://www.copyright.gov/circs/circ66.pdf

32.    On pages 4-5 of that circular, it says in pertinent part …

    "The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work

published when copies of it are distributed to the public by sale or other transfer of ownership if the copyright owner authorizes the end user to retain copies of the work. ***Merely displaying or performing a work online generally does not constitute publication. … Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.*** A copyright owner must have expressly or implicitly authorized users to make ***retainable copies*** of a work by downloading, printing, or other means for the work to be considered published.

The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, ***the Office generally lets the applicant decide whether a particular work is published or unpublished.*** In making this determination, you may wish to consider the following general guidelines.

• Work made available only by streaming. ***Streaming is a performance***, which, in and of itself, ***does not constitute publication***, because, as a practical matter, the end user does not retain a copy of the work when the performance ends.

• ***Work for which downloading or reproduction is expressly prohibited. If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished***, because the end user is not authorized to download, print, or otherwise distribute copies.

• ***Work posted without the authority of the copyright owner.*** The fact that a work was posted on a website without authorization ***does not constitute publication, even if the work can be downloaded or printed from that site***, because the copyright owner did not authorize the end user to retain copies of the work."

33.    Important sections of that excerpt were bolded and italicized for emphasis.

34.    Applying these rules to the instant case, none of the copyrighted works in question here qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or sold. There was no option to download these works for offline viewing, except by third party means. YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide[4], nor have I hosted any of these songs, or March 12 video, on any other services besides Twitch or YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

35.    On Kiwi Farms, any videos that are posted on that site can be downloaded. However, since I (the copyrighted owner) did not put them there, that still does not cause them to be considered "published" as a matter of law, as the Court can clearly see from the above excerpt regarding "work posted without the authority of the copyright owner."

---

4   See https://www.youtube.com/t/terms:

"The following restrictions apply to your use of the Service. You are not allowed to:
1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

36.    However, even if my understanding of the facts is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that, sometimes, it may be "unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendants to prove, not just that I am wrong about this, but that I am objectively unreasonable in forming my belief. If there is any ambiguity in the facts, my preference is entitled deference. Therefore, the songs and video are still legally classified as "unpublished" and there's no two ways about it.

### III-4: The Infringements

37.    My copyrights were infringed upon in the following ways:

#### III-4-A: Reposting the video verbatim with no alterations

38.    At approximately 6:00PM on March 12, 2024, some Kiwi Farms user by the alias "Bruno Powroznik" (or "Bruno" for short) posted the entirety of my video about Kiwi Farms going to the Supreme Court. There were no significant changes or alterations to this post that could even arguably constitute fair use. The only change he made was reducing the video from 30 frames per second down to only 10 frames per seond, and by his own admission, he only did that *because* nothing of value was lost as a result of that change. You couldn't point to anything in this post and say "this is transformative," because there was literally nothing to even point to!

39.    The primary purpose of reposting my video on Kiwi Farms was to enable the Kiwi Farms users to see my video without giving me any algorithmic support, as described in Sec. III-2 of this Complainta bove. As I mentioned in ¶ 16, any views, watch time, or engagement that occurs outside of YouTube's umbrella does no good towards my channel growing. This was precisely the injury Bruno sought to inflict upon me.

40.    I cannot provide the link to this post, owing to the fact that it no longer exists.

#### III-4-B: First DMCA Takedown

41.    At 1:50AM on March 13, 2024 (nearly eight hours after Bruno posted his infringing video), I sent a DMCA Takedown Notice to the email address of legal@kiwifarms.net. This was done pursuant to the instructions found on the webpage of kiwifarms.st/misc/contact, so it was reasonably calculated to reach Joshua Moon.

42.    At 9:18AM that same day (which was likely only 1-2 hours since Joshua Moon woke up that day), co-Defendant Joshua Moon (posting under his username "Null") made a post in that same thread stating "@Bruno Powroznik Acerthorne is DMCA'ing your archive. To be safe, you have to split it up into chapters and add commentary to justify each segment being uploaded by fair use. Add some sort of criticism or commentary." This post *does* still exist as of the time of this writing, and can be viewed at the following URL:

https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-136#post-17943190

43.    Three minutes later, at 9:21AM, Null posted the entirety of my DMCA Takedown Notice

without any information being redacted. That post can be found at the following URL:

https://kiwifarms.st/threads/2024-03-13-david-acerthorn-stebbins-dmca-takedown-request.186272/

44.    At 10:38AM of that same day, Null made a post calling me "a fat smug condescending prick and he uses the court system to harass people into submission. He seems like a really sad, vacuous old man rotting in his decrepit apartment." This post can be found at the following URL:

https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-136#post-17943580

### III-4-C: The "Minimal Criticism" Video

45.    At 3:34PM of March 13, 2024, Bruno – acting pursuant to Moon's express invitation to repost the video mentioned in ¶ 42 above – reposted my video, only this time, he provided some nominal additional commentary. This can be found at the following URL:

https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-137#post-17945566

46.    In this new post, he still copied literally 100% of my original video, literally every single last second of it. He may have *added* a few moments of original content, but he *subtracted* nothing. After all, his goal all along was simply to provide a market substitute for my video, to enable the users of Kiwi Farms to see my video without giving me any algorithmic support. This is evidenced by the undisputed fact that this post was definitively his "Plan B," something he only did because his original "Plan A" (where he reposted the entire video with no additions or non-nominal alterations whatsoever) got taken down. In this post, Bruno alleges that "[I]'ve done videos just like this many times on [my] channel," which is a blatant lie; I never did that once.

47.    While it may be true that he provided *some* amounts of nominal, token criticism in this version of the post, his criticism is few and far between. For example, not counting the opening and closing segments (which were not dedicated to criticizing my video anyway), I was only able to find three segments[5] where he provided more than twenty seconds of original content. By contrast, I was able to identify at least four segments[6] in this reposting where well over a minute of my original video was played without interruption before finally stopping to give any original commentary, and over a dozen segments where more than half a minute of my original video was similarly played without interruption.

48.    When he finally felt like providing original commentary, what little commentary he did provide was the very definition of "threadbare." For example, at timestamp 22:49, literally all he said was "no thank you" in response to my proposal that he watch another video on my channel. That is not criticism or commentary. "[T]he addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative. The new expression must be accompanied by the benchmarks of transformative use." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453-54 (9th Cir. 2020), cert denied 141 S.Ct. 2803 (2021).

---

5   Timestamp 2:49 - 3:20, timestamp 17:49 - 18:10, and timestamp 21:16 - 21:42.
6   Timestamp 4:49 - 6:01, timestamp 12:30 - 13:40, timestamp 18:10 - 19:20, and timestamp 23:11 - 24:23

<u>III-4-D: Second DMCA Takedown</u>

49.     After scrutinizing the reposted video, considering fair use (as required by Lenz v. Universal Music Corp., 815 F. 3d 1145 (9th Cir. 2015)) and finding it to be wanting, I issued another DMCA Takedown Notice to Kiwi Farms at 4:14PM on March 13, 2024.

50.     On March 15, 2024, I received a response from Moon, stating the following:

> Hello,
>
> I declare, under penalty of perjury, that I have a good faith belief that the complaint of copyright violation is based on mistaken information, misidentification of the material in question, or deliberate misreading of the law.
>
> You may send servicing to the following address.
>
> Lolcow LLC
> Custodian of Records
> c/o Matthew Hardin, Esq.
> 1725 I Street NW, Suite 300
> Washington, DC 20006
>
> Kind regards,
> Joshua Moon

51.     This appears to mimmick the language of a template DMCA Counter-Notification. Therefore, he has refused to take down the second infringing post.

**\*\*\*III-5: The seven counts of libel.\*\*\***

52.     On July 25, 2024, Moon, acting in the course and scope of his employment with Lolcow LLC, made a post, visible to the public, on their website of Kiwi Farms, containing numerous libelous statements about me. This post can be found by going to the url of https://kiwifarms.st/threads/2024-07-25-stebbins-dmca-via-gimp-slave.196668/.

53.     As of the time of this writing, this thread has approximately fifty-nine thousand views:



54.     These libelous statements were made out of pure hatred, malice, and spite. This is evidenced throughout the post where gives multiple statements that I am not suing over today due to them qualifying as opinions, but which nevertheless demonstrate the level of hatred, malice, and ill will towards me, including but not limited to...

(a)     calling me a "misery golem" on multiple occasions;

(b)    accusing me of "having zero value and a negative total contribution to society;"

(c)    Listing "[f]uck that fat retard" as a reason to intervene in the California case between me and Jarrod Jones.

55.    The following seven statements about me are all libelous:

***III-5-A: Libel #1: "He studies the law merely to file competent enough litigation for the sake of passing smell tests and costs victims thousands of dollars."***

56.    This is libelous because it grossly misstates my reasons for representing myself in court. I do not file these lawsuits pro se because they are frivolous and simply seek to cost the defendants thousands of dollars. I file them pro se because I cannot afford an attorney. However, prior to any lawsuit (including this First Amended Complaint), I always consult with an attorney using their "free initial consultation" to make sure I have a valid, nonfrivolous case.

57.    This constitutes libel per se because it accuses me of a crime of moral turpitude: Filing frivolous lawsuits for the sole purpose of harassing people, when in fact, I do not file them to harass people, but to seek justice. These people may *feel* harassed by the lawsuits, but that is more of an indicator of their level of self-entitlement (that they think they can do whatever they want to me and suffer no consequences) than it is of my propensity for manipulating the legal system to harass people.

58.    Bear in mind that the libel in this statement comes from his descriptions of what my personal, subjective motive is for taking this course of conduct, not simply the course of condut itself or whatever consequences may or may not result from said conduct. This means that, to prevail on this count of libel on the grounds that the statement is substantially true, the defendant must prove, not just that any combination of courts found the actions to be meritless, but that, even in my personal, subjective point of view, I was only doing it in the first place just to harass them, and that even now, as I type out this First Amended Complaint, I am not merely incorrect, but out and out lying[7] about what my personal motive was. By contrast, I can provide evidence of my motive through my own testimony; the defendants can't.

***III-5-B: Libel #2: "He is also suing Lolcow LLC in its home state of West Virginia to avoid his vexatious litigation status in Arkansas."***

59.    This is libelous because, once again, it grossly misstates the reason for the action. I did not file this lawsuit in West Virginia because I was seeking to bypass *anything* in my home state. I filed it in the Southern District of West Virginia because that's the district which has general personal jurisdiction over co-defendant Lolcow LLC.

60.    In fact, if the defendants' actions in the concurrent case of Greer v. Moon are any indication[8], even if I filed this lawsuit in my home state, the defendants would likely have contested jurisdiction and sought to have the case transferred to their home district anyway!

---

7    Remember: there's a big difference between being wrong about something and lying.

8    That case as originally filed in the Plaintiff's home district: The District of Utah. But the defendants successfully challenged personal jurisdiction and had the case transferred to the district in which Joshua Moon resides (the Northern District of Florida).

61.    See ¶ 56 above for an explanation as to how this is materially false.

***III-5-C: Libel #3: "Jarrod Jones is Stebbins slave."***

62.    This is libel per se because it accuses me of committing a crime of moral turpitude: Owning slaves. "At common law, defamation per se includes ... imputations of a crime of moral turpitude." See Mauck v. City of Martinsburg, 167 W. Va. 332, 336 n.3, 280 S.E.2d 216, 219 n.3 (1981) (citing Restatement (Second) of Torts §§ 571-74 (1977)).

63.    The service provided by Jarrod Jones was not due to slavery, but to a contract which he freely and voluntarily entered into. The negotiations were overseen by California Magistrate Judge Kewalramani and everything was done in accordance with all the laws.

***III-5-D: Libel #4: "This settlement, without exaggeration, forms an indentured servitude contract with Jarrod Jones and Stebbins, which is not permitted under the 13th Amendment because he has not been convicted of any crime."***

64.    Again, this is libel per se because it accuses me of owning slaves, when in fact it was pursuant to a lawful contract.

***III-5-E: Libel #5: "[T]hat misery golem wanted this ... clause so he could bypass his own status as a vexatious litigant in Arkansas"***

65.    This is false. I asked for this clause in the contract so Joshua Moon would not dox me when I filed the DMCA myself. This is defamatory because it accuses me of manipulating the legal system in an unethical and even potentially illegal nanner.

66.    Just like with ¶ 56 above, it is my motive, not the overt actions themselves or the likely consequences thereof, that form the basis for the libel in this case.

***III-5-F: Libel #6: "[T]he misery golem directed his gimp slave to DMCA us, making us a directly impacted party of this mess."***

67.    This is false because Kiwi Farms was already an interested party in the action. As the place where the original copyright infringement was originally posted, it was inevitable that Kiwi Farms was going to be involved in that case one way or another.

68.    This is libelous because it accuses me of dragging them into a dispute they were inevitably going to be a part of regardless.

***III-5-G: Libel #7: "[T]hat misery golem wanted this settlement with this slavery clause so he could bypass his own status as a vexatious litigant in Arkansas"***

69.    This is a repeat of Libel #6. So just see my factual allegations in that subsection.

***III-6: Demand for Withdrawal***

70.    On July 26, 2025, I sent an email to the email address of legal@kiwifarms.net (which, again, is where Josh Moon and Lolcow LLC can both be reached for legal contacts), explaining that these statements are libelous and demanding that he remove them and publish a correction.

71.    Rather than comply with these demands, he instead proceeded to simply post a verbatim copy of that email as an attachment to his original, libelous post. You can see this attachment by going to the link provided in ¶ 52 above, and scrolling to the end of his opening post. Right underneath where he says "discuss," you can see a thumbnail of the retraction demand; clicking on that thumbnail enlarges it so you can read it.

72.    Therefore, I have complied substantively with any laws that West Virgnia may have about demanding retraction of defamatory material.

## IV: LEGAL ARGUMENTS

73.    For the reasons set forth below, the aforementioned factual allegations give rise to a claim of copyright infringement.

### IV-1: Prima Facie Copyright Infringement

74.    "To prove copyright infringement, a plaintiff must show (1) that it owned a valid copyright and (2) that the defendant copied original elements of its copyrighted work." See *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F. 2d 655, 660 (4th Cir. 1993).

75.    The factual allegations in Section III-3 of this Complaint sufficiently plead that I own the copyright to the music and the video I created. Meanwhile, the factual allegations of III-4 of this Complaint sufficiently allege that Bruno Powroznik copied the original elements of said video and publicly displayed them on the Kiwi Farms website. Specifically, it is a violation of my legal monopoly under 17 USC § 106(1) to make copies of the work, as well as my legal monopoly under § 106(4)-(5) to publicly perform and display the work.

76.    Therefore, notwithstanding the applicability of any affirmative defenses, I have sufficiently alleged the essential elements for prima facie copyright infringement.

### IV-2: Safe Harbor and contributory infringement

77.    Before I begin, I'd like to point out that, even if the Defendants have safe harbor, it still would result in total dismissal of this entire case. The statute of 17 USC § 512 specifically states that its safe harbor provisions do not apply to the injunctive relief spoken of in subsection (j). The phrase "except as provided in subsection (j)" appears no less than four times throughout the statute. Therefore, even if the Defendants have safe harbor for everything else, they can still be liable for the injunctive relief I am requesting in V-3 of this Complaint.

78.    That being said, *Greer v. Moon*, 83 F. 4th 1283 (10th Cir. 2023) is instructive in this section. In that case, defendant Joshua Moon was found to be contributorily liable for the copyright infringement of his users because he (A) refused take down the infringing posts when asked, and (B) he "posted his email exchange with Mr. Greer to Kiwi Farms, belittling Mr. Greer's attempt to protect his copyrighted material without resort to litigation." See id at 1295. The latter act, the Tenth Circuit found, "amounted to encouragement of Kiwi Farms users' direct copyright infringement." See id.

79.    In the instant case, the allegations of Sec. III-4-D of this Complaint sufficiently allege that Moon (a) had actual knowledge of the infringing post and (b) refused to take it down.

Meanwhile, the post mentioned in ¶ 43 clearly demonstrates the sort of "belittling" that is contemplated by the Greer court.

80.     This leaves the "encouragement" factor as the Defendant's last bastion of hope for avoiding contributory liability. However, not only did he repost my first DMCA Takedown Notice (which the Tenth Circuit explicitly held "amounted to encouragement"), but also, as I allege in ¶ 42 above, he also made a separate post where he *literally encouraged* Bruno to repost the video with criticism and commentary added! It's hard to imagine a more textbook example of encouragement than *literally encouraging them to do it!*

81.     Therefore, the Defendants have lost their safe harbor and are vicariously liable for contributory infringement.

82.     Of course, none of this matters as long as the second video qualifies as fair use. However, as I've mentioned several times in this complaint already (and am about to go into much more detail momentarily), fair use requires a lot more than just providing a few moments of token criticism and calling it a day.

### IV-3: Fair Use

83.     Moon's post encouraging Bruno to repost the video with criticism and commentary added suggests that he intends to argue the defense of fair use. For the reasons set forth below, the defense should not apply.

84.     Please note that, although I am offering to refute the claim to fair use in the Complaint, I am not required to do so at this stage. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

### IV-3-C: The true "purpose and character" of the use

85.     Before we discuss the Four Factors Test, we should first ask ourselves if the second posting of the video was even done for a fair use purpose in the first place. "When considering the character of a secondary use, the Supreme Court has approved weighing bad faith *against* a secondary user." See Brammer v. Violent Hues Productions, LLC, 922 F. 3d 255, 265 (9th Cir. 2019) (emphasis in original) (citing Harper & Row v. Nation, 471 US 539, 562 (1985)).

86.     As I've made clear, Bruno's "purpose" for doing this was never to provide criticism for its own sake. From the beginning, Bruno's entire ambition was simply to give his fellow Kiwi Farms users a way to see my video without giving me any YouTube algorithmic support. Any criticism he provided in the second posting of the video was definitively a pretext and an after-thought. He never cared about the criticism for its own sake. Therefore, it is this purpose, not the criticism pretext, that should govern the Court's consideration of fair use from this point onward.

87.     However, that is not a legitimate fair use purpose in the first place, which means that the analysis of fair use should end right here, right now, before we even get to the four factors test.

88.     Think about it this way: Imagine how the defendants' logic would hold in any other

context. For example, imagine how this logic would hold up in an employment discrimination case. Imagine if business owner Joshua Moon were employing Bruno Powroznik as middle management. Bruno then proceeded to fire a black employee, and at first, he openly admitted that he was firing the employee simply for being black, only for him and business owner Moon to be in for a rude awakening when the EEOC swoops in and forces them to rehire the black employee. However, immediately after the black employee is rehired, Josh Moon sends an email to every employee's email addresses (including the black employee) where he openly encourages Bruno to come up with some pretextual excuse to re-fire the black employee. Bruno spends only a few hours coming up with the most slap-dash pretextual excuse imaginable, and then proceeds to gleefully re-fire the black employee less than 24 hours after he was re-hired, all the while gloating about how, since he has a pretextual excuse, there's nothing the black employee can do about it, even openly admitting that the excuse is pretextual, telling the black employee to "Be a good boy and don't email [the EEOC] about it." And since the business owner sent his correspondence by email to every employee at the company, that means the black employee has a written proof of this correspondence, just like how I have screenshot proof of all of these publicly-visible forum posts.

89.     In the astronomically rare event someone was actually dumb enough to unironically pull a stunt like that, and leave such a clear paper trail of evidence in their wake while doing it, then the only thing this Court even *could* do in such a case would be to throw the book at them! In fact, the Court likely would not even allow the defendants to argue their case in the first place, since nothing could possibly change the factfinders' mind about the discrimination, since the defendants *admitted in writing that the excuse is pretextual*!

90.     Likewise, in the instant case, the Court should summarily block the Defendants from advancing the fair use defense in the first instance, since, by their own admission, their true "purpose and character" of the use was never for any fair use purpose in the first place, any fair use purpose they can possibly glean out of their use is (by their own admission) a pretext, that necessarily means they can prove no set of facts which would entitle them to the fair use defense, so there's no point in giving them their day in court and we might as well just end the discussion here.

91.     But for the sake of thoroughness, I will discuss the Four Factors Test in-depth, just to show how weak the case was for fair use, even discounting this issue.

<u>IV-3-B: Factor #1 Part 1: Criticism & Commentary</u>

92.     Criticism is often considered quintessential fair use, but that alone is not a silver bullet that guarantees fair use. Simply adding a nonzero amount of criticism does not even guarantee that the first factor will weigh in the defendant's favor, let alone the entire four-factors test set forth in 17 USC § 107. "While the analysis of the first fair use factor may be guided by the examples given in the preamble to § 107, i.e., criticism... not even these works compel a per se finding of fair use. Thus, we do not ask whether [response videos] can be fair use—they can be —but whether [the specific video before the Court in this specific case] is a transformative work." See See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 452 (9th Cir. 2020) (citations and quotations omitted); cert denied 141 S.Ct. 2803 (2021). "[T]he first factor asks 'whether *and to what extent*[9] the use at issue has a purpose or character different from the

---

9  Emphasis in original

original... A use that has a further purpose or different character is said to be 'transformative,' but that too is a matter of degree." See AWF Visual Arts v. Goldsmith, 143 S. Ct. 1258, 1262 (2023).

93.    As I explained in Section III-4-C of this Complaint, Bruno provided only nominal amounts of original content, only some of which could arguably fit the criteria of "criticism and commentary." Just like in AWF v. Goldsmith above, the video mentioned in Section III-4-C should be viewed as "nominally transformative," and therefore not favoring fair use.

94.    The reason the criticism is so threadbare is obvious: It was never supposed to be there in the first place. As I alleged above, Bruno's goal was never to criticize my work in the first place, but rather to simply provide a market substitute where users of Kiwi Farms could see my video without giving me any algorithmic support. Only when his attempts to do that failed, then and only then did he make even the most threadbare effort to slap together something ... anything ... that could nominally pass off as criticism, and then proceed to repost the video less than 24 hours later after doing only the bare minimum effort.

### IV-3-C: Factor #1 Part 2: Commercialization

95.    Bear in mind that the defendants in this case are Joshua Moon and Lolcow LLC, not Bruno Powroznik. Therefore, it is those two defendants who should be analyzed to determine whether or not the underlying use was commercial in nature.

96.    As I explained above, the website of Kiwi Farms is Moon's only livelihood. He relies entirely on donations from his users, but that still counts as a commercial use. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986) ("There is ample evidence that the defendants distributed copies of the parody as an integral part of a financial appeal. All of the letters and television displays involved outright appeals for donations to the [Defendants]"). In the instant case, as I explain in ¶ 9, the bottom of every webpage contains a link called "how to support the forum," which takes those who click on it to a post containing outright appeals for donations. Therefore, this website is just as commercial as Moral Majority's televised requests for donations.

97.    But even if the Court insists on analyzing Bruno's actions, rather than those of the actual defendants, lest we forget that Bruno's intention was to sabotage my ability to make money off of my video. By depriving me of algorithmic support, he is also depriving me of ad revenue, in both the near and distant future. See Greer, supra at 1295 ("Indeed, Kiwi Farms users had been uploading Mr. Greer's copyrighted materials with the explicit goal of avoiding anyone 'accidentally giving Mr. Greer money'").

98.    The malicious attempt to sabotage the plaintiff's ability to profit off of his copyrighted work(s) should be just as much of a "commercial endeavor" for purposes of fair use as if they actively tried to profit off of it themselves. After all, vandalism (where the criminal is not enriching himself but is still depriving his victim of the item in question) is often seen as a worse crime than theft. Theft can sometimes be a crime of poverty or desperation (which is more sympathetic than pure greed), whereas vandalism is a violent crime that is almost always done out of malice. The Court should make a similar finding here.

### IV-3-D: Factor #2: Nature of the Copyrighted Work

99.     First, as I explained in III-3-C of this Complaint, the songs, and the video, are all unpublished. That alone should cause the second factor to weigh against fair use.

100.     As to the level of creativity, there are two ways the Court could look at the case. Remember that I am suing over the infringement of my copyrighted songs, but it was my commentary and narration that the defendants are seeking to criticize in their thinly-veiled attempt to get fair use. So which one should the Court look to when determining how to decide the second factor?

101.     It ultimately doesn't matter, because the second sub-factor weighs against fair use regardless. If we assume the music is controlling, then it's obvious that the second factor weighs against fair use, because music is inherently highly creative. But if we assume that my commentary and narration is controlling, then the Court should still consider the content to be more creative than factual. After all, the point of me making that video was to give my *opinion* on a current event. Opinions are considered creative for purposes of the second factor of fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014) ("Where the excerpts of Plaintiffs' works contained… the author's experiences or opinions, the District Court should have held that the second factor… weighed against fair use"). So either way, both sub-factors of Factor #2 weigh against fair use.

### IV-3-E: Factor #3: Amount & Substantiality of the Portion Used

102.     As stated previously, the infringement in Section III-4-C takes literally 100% of my original video, literally every single last second of it. This necessarily causes the third factor to weigh against fair use, per se, as a bright line rule. "Copying an entire work weighs against finding a fair use." See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 311-12 (4th Cir. 2010) (quoting Sundeman v. Seajay Society, Inc., 142 F. 3d 194, 205 (4th Cir. 1998)).

103.     Of course, this is not an absolute requirement. "The extent of permissible copying varies with the purpose and character of the use." See Sunderman, supra at 205-06. However, as I explained in Section IV-3-A above, the "purpose and character of the use" in this case was to create a market substitute. To that end, no use at all could be seen as permissible, let alone 100%.

104.     But even if the Court insists on treating criticism as the true "character and purpose" of the second infringement, despite the arguments put forth in Section IV-3-A, that still does not justify 100% copying, especially considering how de minimus his criticism and commentary actually was. So no matter how you look at it, the third factor weighs against fair use, period.

### IV-3-F: Effect on the Market

105.     "This last factor is undoubtedly the single most important element of fair use." See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 312 (4th Cir. 2010) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the

copyrighted work … If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

106.    It is also important to note that the defendant necessarily holds the burden of proof on this issue. See Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-60.

107.    That being said, the Defendants copied the entirety of my original video, literally every single last second of it. This constitutes a market substitute, per se. See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 313 (4th Cir. 2010) ("[W]hen a commercial use amounts to mere duplication of the entirety of an original it... serves as a market replacement for it").

(a)    See also Hustler Magazine v. Moral Majority, 796 F. 2d 1148, 1154 (9th Cir. 1986) ("[B]y copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's").

(b)    See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014) ("[W]ere a book reviewer to quote the entire book in his review… he would be cutting into the publisher's market, and the defense of fair use would fail").

(c)    See also Consumers Union of US v. General Signal, 724 F. 2d 1044, 1051 (2nd 1983) ("The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work").

(d)    See also https://youtu.be/1Jwo5qc78QU?t=1158 (timestamp 19:18 - 20:22) ("Mystery Science Theater was … absolutely transformative, but they still licensed the movies… because yeah, playing someone else's entire movie, just with wisecracks over it? Probably not fair use!").

(e)    See also www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS ("by showing those clips in full to the audience… it's entirely possible that you might not watch the [original] videos because you saw, basically, the whole thing in [the defendant]'s videos").

(f)    See also www.youtube.com/clip/Ugkxp9Ev6N8qsYViDPqkrtAuE8nZZWpq8oD7 ("So yes, you can add some original commentary... but if it completely displaces the market for the original, it's probably not fair use, and it's pretty obvious that, once you see a video… you're not gonna go back and watch the whole video again").

(g)    See also www.youtube.com/clip/Ugkxznh99XHVyjyPhyQKWiWE_n8XASNgbpxW ("Honestly, were it not public domain, I don't think it would meet the transformative requirements for fair use parody protection. Large parts of the original text are copy-pasted pretty much verbatim, punctuated only occasionally with Arabella's cynical or horrified thoughts on the matter… this isn't really Matt Youngmark's book; it's Frank L. Balm's book with sarcastic commentary penciled into the margins").

108.    In fact, not only does this video necessarily create a market substitute for my original video, but, as has been clearly established all throughout this Complaint, that was, in fact, the Defendants' entire goal all along. The Defendants accomplished exactly what they set out to do and they should be judged accordingly.

### IV-3-G: Fair Use in Conclusion

109.    In conclusion, we have three of the four factors weighing definitively against fair use, with one factor (the first factor) being an extremely borderline case, given how few and far between the criticism actually is, and how undeniably commercial the site on which it is hosted is. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use") (citations omitted).

110.    With 3½ factors weighing against the Defendants as a matter of course, that leaves criticism as their last bastion of hope for obtaining fair use. However, with 3½ factors weighing against them right out of the gate, then unless the criticism Bruno provides is *absolute gold* – not just disagreeing with opinions or saying that my voice is annoying, but extremely profound, downright philosophical commentary, the kind that Confucius himself would tip his hat to – then their case for fair use is effectively dead on arrival.

### IV-4: Other Copyright Defenses

### IV-4-A: Archival Defense

111.    In his post in ¶ 42 above, Moon referred to the first infringement as an "archive." In my experience dealing with trolls attempting to infringe on my copyright in the past, this word has come up frequently, so it is worth nominally addressing here.

112.    While archival is technically recognized at law as a defense to copyright (see 17 USC §108), it is not easy to get. For starters, in order to be eligible to even raise a defense of archival in the first place (let alone prevail on the merits), you have to be either a library or an archives (or an employee of same). That's it. Those are the only two entities eligible to even bring an archival defense in the first place. Even other entities who regularly perform archival-like functions (e.g. museums) are not eligible for the archival defense. The statute of § 108(a) does not say "an entity such as a library or archives." It just says "a library or archives." Therefore, that list of eligible entities should be taken as exclusive. Even if we could assume that the list of entities eligible for the archival defense could be expanded to some degree, it would be preposterous to assume that any random person on the Internet is legally empowered to repost whatever copyrighted content he wants, in its entirety, on whatever website he wants, simply call out the word "Archive!" like how one calls out the word "Safe!" in a game of tag, and expect that to be legally binding. Such a prospect is ludicrous on its face.

113.    But even barring that, there is another requirement in the statute that the Defendants and direct infringer in this case utterly fail to meet: Whenever the archived copy is kept in a digital format (as is the case here), the copy is not allowed to be distributed outside of the building in which it is stored. See 17 USC § 108(b)(2) and § 108(c)(2). As a result, it is legally impossible

for any alleged "archive" of a YouTube video to be made available on a publicly-visible webpage like this one and still be eligible for the archival defense.

114.     Therefore, the archival defense–should the Defendants try to raise it–is patently frivolous.

IV-4-B: Other Defenses

115.     No other defenses are worth even nominally considering. Neither the songs nor the video are public domain. My original narration possesses minimum creative spark, and even if it doesn't, the songs certainly do. The composer signed a contract selling the copyrights to me. The factual allegations of ¶ 30 of this Complaint preclude the "innocent infringement" defense found in 17 USC § 504(c)(2). The registration for these songs was long completed over a year before the infringement occurred, so there is no hope for a dismissal under Fourth Estate Public Corp v. Wall-Street.com, LLC, 139 S. Ct. 881 (2019).

116.     If the Defendants want to attack the validity of the registration, they have their work cut out for them, since the plain text of 17 USC § 411(b)(1) makes clear that a registration can only be invalidated if the Defendants prove both (A) that I subjectively knew, at the time I submitted the application, the some of the information I provided was false[10] (not simply that I made a mistake), and (B) that, if I hadn't lied, the Copyright Office would have refused my registration in its entirety (not just registered under a different category or similar minor deficiencies). So if the Defendants want to raise this argument, they have quite an uphill battle ahead of them. Even if they ultimately managed to prevail, it still wouldn't save them in the long run, because if that's the only defense they can raise, without also invalidating the copyright itself[11], then the worst that could happen is that this case be dismissed without prejudice, allowing me to re-file the complaint once I obtain a proper registration.

117.     In conclusion, there really is no nonfrivolous defense the Defendants can possibly raise to copyright infringement.

***IV-5: Libel***

118.     "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." See Haught v. Fletcher, 874 S.E.2d 27, 29 (2022).

119.     Josh Moon clearly made the seven defamatory statements in question. The Court can see that with its own two eyes simply by going to the URL provided in ¶ 52 above. Therefore, Element #1 is sufficiently plead.

120.     To be "nonprivileged," it just means there was no legal privilege (such as the litigation privilege or the attorney-client privilege) at play. The total lack of such a privilege is axiomatic in this case. Meanwhile, it was undoubtedly communicate to numerous third parties, as clearly evidenced by the fact that, as of the time of this writing, the post has approximately fifty-nine

---

10 For this element, it is important to note that even mistakes of law are excusable under that standard, as long as the mistake was an honest one. See Unicolors, Inc. v. H&M Hennes & Mauritz, LP, 142 S. Ct. 941 (2022).
11 e.g. by arguing that Navarro never properly transferred the copyright to me or by arguing that the songs somehow lack minimum creative spark

thousand views. Any one of those people, by themselves, would be sufficient to satisfy the element of "to a third party." Therefore, Element #2 is sufficiently plead.

121.    As I explained in each subsection in Section III-5 above, each statement was materially false for the reasons I set forth above. Therefore, Element #3 is sufficiently plead.

122.    Each of these statements were very clearly about me. Nobody in their right mind would dispute that. Therefore, Element #4 is sufficiently plead.

123.    The defendants undoubtedly acted willfully and maliciously in their actions, accusing me of heinous acts, knowing them to be false, or, at a minimum, knowing that they had zero empirical evidence to support their claims. Therefore, Element #5 is sufficiently plead.

124.    Element #6 does not need to be plead because the majority of these libels are libel per se, accusing me of crimes of moral turpitude, such as slave ownership, harassment, and obstruction of justice. "In these cases, the derogatory statement(s) are automatically considered to have caused damage." See https://kellywarnerlaw.com/west-virgina-defamation-laws.

125.    Therefore, I have sufficiently plead the essential elements for the tort of libel.

### ***IV-5-A: Possible Defense of "Rhetorical Hyperbole"***

126.    The defendants may attempt to raise the defense of "rhetorical hyperbole." Moreover, unlike the defense of substantial truth, this is a defense that the Court could in theory find of its own accord under a § 1915(e) review, so it is worth nominally addressing here.

127.    First of all, at least in Libel #4, Moon clearly stated that his accusation against me was "without exaggeration." Those were his *exact* words. So at least in regards to Libel #4, this defense is lost by the defendant's own admission.

128.    Barring that, to qualify for the defense of rhetorical hyperbole, it is not enough that the defendant simply exaggerated just a little bit. The defense requires that the defendant's statements must be so ludicrous, so absurd on their face, that the speech "could not reasonably have been interpreted as stating actual facts about." See Hustler Magazine, Inc. v. Falwell, 485 US 46, 50 (1988). In other words, if a certain statement has multiple reasonable interpretations, and even one of them is stating actual facts, there is no rhetorical hyperbole defense.

129.    It must be something that "even the most careless reader" would immediately notice as hyperbolic. See Long v. Egnor, 346 SE 2d 778, 784 n.8 (1986). A factual interpretation of the statement (or at least a reasonable one) must be literally impossible. See Matter of Callaghan, 796 SE 2d 604, 626 (2017) ("In spite of Judge-Elect Callaghan's contention that 'the idea that the President of the United States would `party' with a Nicholas County Circuit Court Judge is ridiculous on its face,' we can perceive of no reason why Judge Johnson *could not* have been invited to the White House by President Obama or on his behalf to what could be characterized as a 'party' 'in support of' the President's 'legislative agenda' as stated on the flyer") (emphasis in original).

130.    Such a high burden is not present in the instant case. Even discounting the one time when Moon literally said that his accusation was being made "without exaggeration," the things he is accusing me of are not out of the question to the point of sheer absurdity. Forum shopping?

Filing lawsuits for the sole motive of harassing people? These are not nearly as outlandish as the parody depicting Jerry Falwell of drunkenly sleeping with his own mother.

131.    The closest you can get to an accusation that is outlandish to the point of sheer absurdity is his accusations that I'm owning slaves. To be fair, he certainly seems determined to crank the ham up to 11 surrounding this accusation in particular, seeing as how he calls Jarrod Jones a "gimp slave" and a "proxy slave boy" on multiple occasions, and says near the end that "[s]ome users of this website support repealing the 13th amendment." However...

(a)    Again, in one of these accusations, he disavowed any interest in using the "rhetorical hyperbole" defense when he said in no uncertain terms that the accusation was being made "without exaggeration." Based on this, the only reasonable interpretation of his other accusations of slavery – based on the legal maxim of noscitur a sociis ("a word is known by its associates") – that his other accusations of slavery were similarly "without exaggeration;" and...

(b)    Again, it's still not that outlandish when you actually look at the facts. In fact, even in the United States, and even in the modern era, it is estimated that over a million people are currently enslaved in the USA, albeit illegally. See https://www.walkfree.org/global-slavery-index/country-studies/united-states/.

132.    Therefore, the defense of rhetorical hyperbole is inapplicable in this case. At a minimum, it cannot be adjudicated on a Motion to Dismiss or § 1915(e) review.

### V: RELIEF REQUESTED

133.    I hereby ask the Court to award me the following relief:

### ***V-1: Declaratory Judgment***

134.    First, I seek a declaratory judgment that ...

(a)    The copyright to six of my copyrighted songs were unlawfully infringed upon on the Kiwi Farms website on March 13, 2024;

(b)    Defendants Joshua Moon and Lolcow LLC are vicariously liable for the infringement; and

(c)    The infringement was done willfully and maliciously to prevent me from profitting off of the video and stunting my YouTube channel growth by starving my video of algorithmic support.

135.    The third declaration not only enables the Court to award statutory damages of up to $150,000 per copyrighted work infringed, pursuant to 17 USC § 504(c)(2), but also ensures that Moon cannot discharge this debt in bankruptcy, pursuant to 11 USC § 523(a)(6).

136.    ***For the seven counts of libel, I ask that the Court declare that the defendants willfully and maliciously defamed me, knowing their statements to be false and actively not caring. This will also prevent the damages for libel from being discharged in bankruptcy.***

### V-2: Statutory Damages for Copyright Infringement

137.    I then ask the Court to award me statutory damages of $900,000. That amounts to $150,000 for each of the six copyrighted songs which were infringed upon.

138.    I also ask the Court to award me all costs incurred. So far, that includes $85 for the cost of registering the copyright for these songs and approximately $15 for the cost of printing out this Complaint and mailing it to the Court in a USPS Priority Mail Flat-Rate envelope. Other costs will be addressed when I get the judgment.

### ***V-3: Damages for Libel***

139.    For the libel, I request $100 per day for each day the libelous statements remain published, for each count of libel. This comes out to a total of $700 per day.

140.    I wish to invoke the 8th Circuit precedent of Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999). In that prison segregation case, Plaintiff Charles Trobaugh was awarded only $1 in nominal damages when the district court found that the Defendants had unconstitutionally put him in solitary confinement for three days in retaliation for exercising his First Amendment right to file prison grievances. The 8th Circuit Court of Appeals affirmed the finding of liability, but overturned the award of nominal damages, finding that, when (A) the tortuous act is considered harmful per se (as is the case with defamation per se), (B) the exact economic value of the injury is difficult to calculate with precision, and (C) the tortuous behavior (and, therefore, the harm) was kept up perpetually over a period of multiple days, then the district court should award compensatory damages of approximately $100 for every day the tortuous behavior was kept up. See id at 1088-89. This was purely an award of compensatory damages; the Court of Appeals directed the district court to also award punitive damages on top of that.

141.    For purposes of this case, I will refer to these "$100 per day of tortuous conduct" damages as "Trobaugh Damages" for simplicity's sake.

142.    Since there are seven counts of libel, that means I should receive $700 per day in trobaugh damages for the libel. Since the libel was published on July 25, 2024, that is the date from which $100 per day, per count of libel, should begin accruing. As of the time of this writing (July 11, 2025), the seven libels will have been published for 351 days. This means that, assuming the libel is taken down on July 11, 2025 (not even when this First Amended Complaint reaches the West Virginia Courthouse), then he should owe me trobaugh damages of $245,700. By July 25, 2025 (the one year anniversary of their original publication), he will have accumulated trobaugh damages of $255,500 if he doesn't take any of them down, so on and so forth.

143.    Also, bear in mind that these libelous statements were undoubtedly made out of pure hatred, malice, and spite towards me. Therefore, punitive damages are appropriate, and are not covered by the aforementioned Trobaugh damages. See Trobaugh, supra at 1089 ("Further, we ask the District Court to reconsider awarding punitive damages"). Therefore, I also request three times the trobaugh damages (the amount that the judge in Liebeck v. McDonalds Restaurants reduced the punitive damages award down to) in punitive damages. Therefore, if Moon goes one whole year without retracting his libelous statements, he should owe me combined damages for libel to the tune of $1,022,000.

144.     However, for what it's worth, if Moon were to retract his libelous statements immediately after this First Amended Complaint reaches the West Virginia Courthouse, *and publish adequate corrective posts[12]*, that may constitute some proof that he as acting in good faith all along, which would not only stop the trobaugh damages from accumulating, but may even lessen the punitive damages, even for days which have already elapsed. I have printed and preserved a copy of the post linked to in ¶ 52 above, so taking it down will not stop us from introducing the post into evidence.

### ***V-4: Injunctive Relief***

145.     Next, I request injunctive relief pursuant to 17 USC § 512(j). Specifically, I ask that the Defendant be enjoined to ...

(a)     remove the infringing post, pursuant to 17 USC § 512(j)(1)(A)(i);

(b)     permanently terminate Bruno Powroznik's account with Kiwi Farms, pursuant to 17 USC § 512(j)(1)(A)(ii); and

(c)     take whatever measures are necessary to prevent future infringement of these songs, and to prevent Bruno from rejoining the site after being banned, pursuant to 17 USC § 512(j)(1)(A)(iii).

146.     As I explained in ¶ 56 above, I am still eligible for this relief, even if the Defendants have safe harbor for everything else.

147.     ***For the libel claims, I ask that the Court issue an injunction ordering the defendants to remove their libelous statements from their post, or in the alternative to take the post down entirely, as the only purpose it was originally meant to serve (debating whether or not to honor the DMCA Takedown Notice and/or intervene in the underlying copyright infringement action) has long since ended.***

### V-5: Other Relief

148.     In addition, I also ask for whatever other relief the Court, in its sound discretion, believes is necessary to make me whole.

---

12  This part is imperative to demonstrating good faith and, therefore, mitigating punitive damages.

## VI: CONCLUSION

149.    Wherefore, premises considered, I respectfully pray that judgment be entered in my favor, costs incurred be awarded, and for any other relief to which I may be entitled.

So requested on this, the 11th day of July, 2025.

David Stebbins (pro se)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 204-6516
acerthorn@yahoo.com